**In re Randal MASTRANGELO, Debtor.**

**KOPELMAN & SHATZ, INC., Plaintiff,**

v.

**Randal MASTRANGELO, Defendant.**

Bankruptcy No. 82–01609.
Adv. No. A82–1199.

United States Bankruptcy Court,
D. Massachusetts.

May 13, 1983.

James Michael Merberg, Boston, Mass., for plaintiff.

Charles M. MacLean, Mainini & Mainini, Inc., Framingham, Mass., for defendant.

## MEMORANDUM ON DISCHARGEABILITY

HAROLD LAVIEN, Bankruptcy Judge.

The debtor, Randal Mastrangelo, filed a voluntary petition in Chapter 7 on August

31, 1982. Kopelman & Shatz, Inc., the plaintiff, objects to the discharge of a debt owed to it by the debtor based on 11 U.S.C. § 523(a)(4).

As a result of the trial, I find the following facts. The debtor was the major shareholder and president of Framingham Casting, Inc. ("Casting"). The company manufactured jewelry, models and settings for other jewelers.

In the spring of 1981, Casting was experiencing cash flow difficulties. There had been considerable check overdrafts, but these overdrafts were usually eventually covered.

The transaction which led to the present complaint occurred on June 18, 1981. On that day, the debtor was driven into downtown Boston by his brother. They made several stops at wholesale diamond dealers while in Boston. They stopped at Kopelman & Shatz, Inc., a wholesale diamond dealer located in downtown Boston for whom Casting did work but had not previously purchased diamonds. Mr. Mastrangelo then met with Mr. Shatz and received two diamonds on a memorandum agreement ("on memo"). Taking a diamond on memorandum agreement means that a person receives the diamonds without paying for them based on the signed agreement. The agreement usually provides that the owner retains title, but the recipient may sell the diamonds. Essentially, it is a consignment transaction. The diamonds were listed on the memo as worth $4,380 and $4,725. The memo was signed by the debtor on behalf of Casting.

Mr. Shatz, the president of Kopelman & Shatz and the person who gave the diamonds to the debtor, testified that giving diamonds on memo is a common practice in the diamond industry. From his point of view the memo meant that title did not pass and that the person who receives the merchandise promises to protect the product. He testified that it is not unusual for members of the Diamond Dealers Club to allow a $350,000 diamond to go on memo. Mr. Shatz testified that prior to June 18, he had never met nor spoken to Mr. Mastrangelo although Kopelman & Shatz had given piece work to Framingham Casting in the past. Another employee of Casting had handled that work.

After the debtor took the diamonds on memo, Mr. Shatz was told by Bobby Kopelman, an employee of Kopelman & Shatz, that he had received a phone call from Mastrangelo on Monday, June 22nd, stating that he was using the two stones and requesting a bill. Mr. Shatz then tried to reach Mastrangelo by phone on June 22nd and 23rd, but could not reach him. Mr. Shatz claimed that he became suspicious because usually when two stones are taken, one is sold and one is returned. He claimed he tried to reach the debtor to demand return of the diamonds.

The diamonds have never been found. Mr. Mastrangelo testified to the following sequence of events. Mr. Mastrangelo claimed that he called Mr. Shatz in the first week of June and told them he had a client for this particular type of diamond. He claimed one of his employees, Susan Foster, had received an order. Susan Foster neither appeared at trial nor testified in any other manner. On June 18th, he took the two diamonds from Shatz on memo. There was no discussion as to the terms of the memo or when the diamonds were to be returned.[1] That evening his business asso-

---

1. The fine print on the memo signed by the debtor reads as follows:

The goods described and valued as below are delivered for your inspection and selection only, remaining the property of KOPELMAN & SHATZ, INC. at all times and subject to the order of KOPELMAN & SHATZ, INC. and to be returned to KOPELMAN & SHATZ, INC. on demand. A sale or contract of sale shall take effect only when and after a regular bill is rendered by KOPELMAN & SHATZ, INC. for

goods selected. In the event of loss or destruction of the goods or any portion thereof from any cause whatever, the consignee agrees to indemnify KOPELMAN & SHATZ, INC. for the said loss and destruction in the amount stated herein as the value of the goods, which valuation the consignee accepts and agrees to be the fair value of the goods. The consignee agrees to keep the merchandise insured against fire, theft and burglary in an amount not less than

ciate, Rock Gnatovich, visited Mastrangelo's home and advised the debtor that the Massachusetts Department of Revenue had left a notice of levy at the shop. Mastrangelo also delivered a diamond from Guiness, another diamond wholesaler the debtor visited that day, to Gnatovich. That transaction is discussed later. The next day, a Friday, Mastrangelo went to work and showed the diamonds to Susan Foster and then put them in the safe. Over the weekend, Mastrangelo claims he tried to raise capital for Casting since the financial situation had become serious and he had not been able to pay his employees. He claimed that he also tried to sell the stones. He called Kopelman & Shatz on Monday, June 22nd, and told Bobby Kopelman he had a buyer for the stones and asked to be billed. On Tuesday, June 23rd, Mastrangelo cleaned up the shop and put all valuables in the safe. Mastrangelo's brother helped him close up and testified at the trial that he saw diamond papers in the safe but did not actually see the diamonds. Diamond paper is a special envelope used for storing diamonds. Mastrangelo did not return to the shop until Saturday, June 27th. On Friday, one of the other suppliers of precious stones, Lustre Diamonds, had procured a restraining order from the Suffolk Superior Court which provided that "Framingham Casting Co., Inc. and its agents, attorneys and counsellors, and each and every one of them, to desist and refrain from interferring (sic) with the plaintiff's taking possession of the goods described in Exhibit A belonging to the plaintiff, including taking possession of the safe for the purpose of locating Plaintiff's merchandise in it." Lustre Diamonds, with the aid of the Framingham police, broke into Casting's place of business and removed everything from the safe. Mastrangelo claimed that the Kopelman diamonds were in the safe when the property was taken.

Robert Kopelman later attended a meeting at the Shawmut bank where all the contents of the safe had allegedly been taken. When he inspected the contents, he did not find the Kopelman & Shatz diamonds.

A letter on Framingham Casting's stationery, dated June 25, 1981, and signed by Randal Mastrangelo, was sent to and received by Kopelman & Shatz, Inc. The letter stated:

Dear Sirs:

This letter is to confirm our telephone conversation of Monday, June 22, 1981. I informed you that the diamonds on memo # 86928 had been taken by our customer and asked to be billed.

You informed me that a bill would be forthcoming. Please check your records to see if it was sent.

In actuality, the diamonds had not "been taken by" a customer since Mr. Mastrangelo claimed he had put them in his safe and had not sold them.

Mr. Mastrangelo testified that on Sunday, June 21st, he called a former college roommate and close lawyer friend who lived in New Jersey and his friend allegedly agreed to take the diamonds for cost plus a 20% mark-up. The friend was also allegedly trying to raise capital for Casting. At the Court's request, the debtor presented his phone bills [2] for that period. The bill did reflect a phone call to Toms River, New Jersey, on June 21st. The bill also reflected calls to Toms River, New Jersey, on June 16, June 17, June 22, and June 24. The debtor's friend now lives in California and did not testify at the trial.

A former employee or business associate and friend of the debtor, named Rock Gnatovich, also testified at the trial. Mr. Gnatovich claimed he made a $10,000 capital contribution to Casting Co., which he never received back. In June of 1981, he asked for his money back. On June 18, 1981, the debtor obtained two stones from Guiness, another diamond wholesaler. After Gnato-

---

the value herein set forth for the benefit of the consignor.

REPORT MUST BE MADE WITHIN FIVE DAYS.

2. The bills were actually in the name of the debtor's wife.

vich rejected one stone, the debtor obtained another and both stones were given to Gnatovich with the memorandum agreement. Gnatovich testified that Mastrangelo told him that Mastrangelo would assume responsibility for payment of the stones. Gnatovich testified that he knew the diamonds had not been paid for when he received them. He gave the debtor $3,500 when he received the stones.

Gnatovich eventually returned the stones to Guiness in order to avoid being prosecuted for receiving stolen property.

The debtor and Gnatovich had been involved in another business in 1975–76. Although they had once been friends, the relationship deteriorated when Gnatovich demanded his money back.

Mr. Mastrangelo disputed Mr. Gnatovich's testimony. The debtor claimed that Gnatovich paid $3,500 towards the purchase of the diamonds and was supposed to pay the balance when he sold the stones.

The Kopelman & Shatz diamonds have never been returned, nor have they ever been found. The plaintiff asserts that under 11 U.S.C. § 523(a)(4), the debt owed to it by the debtor is nondischargeable. Section 523(a)(4) provides:

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

The plaintiff does not seek to prove that the debtor was a fiduciary but claims that the debtor's actions constitute a common law larceny or embezzlement. *See Matter of Angelle,* 610 F.2d 1335, 1341 n. 12 (5th Cir.1980); 3 *Collier on Bankruptcy* ¶ 523.-15[3] (15th Ed.1982).

■ Larceny at common law may be defined as the (1) trespassory (2) taking and (3) carrying away of the (4) personal property (5) of another (6) with the intent to steal. LaFave & Scott, *Handbook On Criminal Law,* § 85 at 622 (West 1972) [LaFave & Scott]. In order to find a common law larceny, the Court must find that Mastran-

gelo intended to steal the diamonds at the time he received them on memo from Kopelman & Shatz. Further, under the technicalities of the criminal law there is no larceny if the owner of the property consents to the defendant's taking his property. *Id.* I find that it has not been proven by clear and convincing evidence that Mastrangelo intended to steal the diamonds at the time he received them on memo.

■ The evidence as to the commission of a common law embezzlement is much stronger. An embezzlement may be defined as (1) the fraudulent (2) conversion of (3) the property (4) of another (5) by one who is already in lawful possession. LaFave & Scott, *supra,* § 89 at 644. In order to find an embezzlement, the Court must find that a fraudulent conversion of the property took place. Conversion requires a serious act of interference with the owner's rights. *Id.* Although it may have been that Mastrangelo intended to show the diamonds to a customer, found by one of his employees, when he took them on memo on June 18th, it is clear from the testimony that he never showed the diamonds to any customer. Yet, by letter dated June 25, he informs Kopelman & Shatz that "the diamonds on memo # 86928 had been taken by our customer." Once he sends that letter and makes the earlier telephone call to the same effect, it is clear that Mastrangelo had no intention of returning the diamonds to Kopelman & Shatz. Although he requests a bill, the debtor lied in the letter, for the diamonds had not been taken by any customer. The debtor asserts there was no fraudulent intent involved because he had lined up a customer with his friend in New Jersey. I do not find this excuse credible. At the time he is dealing with this very close friend, and in desperate financial condition, there is no request for any payment for the stones though Casting has been forced to close because it cannot make payroll and the Massachusetts Department of Revenue has levied on the business. I find that no sale had been made to the friend in New Jersey, or anyone else. Intent is a state of mind which may be interpreted by

the conduct of the person implicated. *In re Moran,* 456 F.2d 1030, 1031 (3rd Cir.1972). An unconfirmed story about the possibility of a sale does not negate the inference to be drawn from the other actions of the debtor. The debtor had possession of the diamonds and lied when he wrote to Kopelman & Shatz. He also felt no compunction about giving an unpaid for diamond to his business associate. He has not satisfactorily explained the disappearance of the diamonds. No evidence was presented that any other items were missing from the safe after the seizure by Lustre. The Court can only conclude under these facts that Mastrangelo converted the diamonds to his own use and that a common law embezzlement did occur. Therefore, the debt is nondischargeable under 11 U.S.C. § 523(a)(4).

Based upon the above findings of fact and rulings of law, the debt owed to Kopelman & Shatz for the two diamonds is nondischargeable in the amount of $9,105.